IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DEBORAH PRICE AND WILLIAM
PRICE, on their own behalf and on
behalf of all others similarly situated,

    *Plaintiffs*,

v.

21ST MORTGAGE CORPORATION,

    *Defendant*.

Civil Action No. ELH-21-3017

**MEMORANDUM OPINION**

In a "First Amended Class Action Complaint" (ECF 20," Amended Complaint"), plaintiffs

Deborah Price and William Price (the "Prices") filed suit on their own behalf and for a putative

class against defendant 21st Mortgage Corporation.[1]  They allege, *inter alia*, violations of

Maryland's Credit Grantor Closed End Credit Provisions ("CLEC"), Md. Code (2013 Repl. Vol.),

§§ 12-1001 *et seq*. of the Commercial Law Article ("C.L.").  In particular, plaintiffs complain

about various fees in connection with a loan they obtained from defendant, pursuant to a Retail

Installment Sale Contract ("RISC").  *Id.* ¶¶ 4-13.  The fees include "Origination Points," "Late

Fees," and "Insurance Premiums."  *Id.* ¶¶ 5-7.

In the Amended Complaint, plaintiffs assert six causes of action: Declaratory and

Injunctive Relief under Maryland law, Md. Code (2013 Repl. Vol.), § 3-406 of the Courts and

Judicial Proceedings Article ("C.J.") (Count One); Violation of CLEC, C.L. § 12-1005(a)(2)(ii),

related to defendant's charge and collection of the Origination Fee (Count Two); Violation of

---

[1] Suit was initially filed in the Circuit Court for Baltimore City.  ECF 1-2.  Defendant
timely removed this case to federal court on November 24, 2021, on the basis of diversity of
citizenship, pursuant to 28 U.S.C. § 1332.  ECF 1 ("Notice of Removal").

CLEC, C.L. § 12-1005(d)(1), related to defendant's charge and collection of insurance premiums (Count Three); Violation of CLEC, C.L. § 12-1008, related to defendant's charge and collection of late fees (Count Four); Breach of Contract, related to defendant's charge and collection of the late fees (Count Five); and Breach of Contract, related to defendant's charge and collection of insurance premiums (Count Six). *See* ECF 20, ¶¶ 75-136.

Defendant moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  ECF 23.[2]  The motion is supported by a memorandum (ECF 23-1) (collectively, the "Motion to Dismiss"), as well as several exhibits.  ECF 23-2 to ECF 23-5.  Plaintiffs oppose the Motion to Dismiss (ECF 25, the "Opposition"), supported by exhibits.  ECF 25-1 to ECF 25-4.  Defendant replied (ECF 33, the "Reply"), and submitted another exhibit.  ECF 33-1.

Thereafter, defendant filed a "Motion for Leave to Provide Additional Authority in Support of 21st Mortgage's Motion to Dismiss."  ECF 42 ("Motion for Leave").  By Order of December 6, 2022, the Court granted the Motion for Leave but indicated that, by December 20, 2022, "Plaintiffs may move to rescind this Order as improvidently granted.  Alternatively, Plaintiffs may respond by Dec. 21, 2022." ECF 43.  Plaintiffs subsequently filed a "Motion to Rescind the Order Granting Motion For Leave . . . ." ECF 44 ("Motion to Rescind").  They also filed a "Motion to Strike Defendant's Motion for Leave . . . ." ECF 45 ("Motion to Strike").  Defendant responded.  ECF 46.

No hearing is necessary to resolve the motions.  *See* Local Rule 105.6.  I will deny the Motion to Rescind and the Motion to Strike.  And, for the reasons that follow, I shall grant the Motion to Dismiss in part and deny it in part.

---

[2] The defense moved to dismiss the initial Complaint.  *See* ECF 6, ECF 19.  The Amended Complaint followed.  ECF 20.

## I. Factual and Procedural Background[3]

On February 3, 2017, plaintiffs purchased a 2016 "manufactured home" (*i.e.*, the "Vehicle") and financed that purchase with a loan (the "Loan") from defendant in the sum of $71,455. ECF 20, ¶¶ 19, 21, 24. The Loan for the mobile home was memorialized in a RISC. *Id.* ¶¶ 21, 41, 42; *see* ECF 23-2. The RISC "elects to be governed by CLEC." ECF 20, ¶ 22.

At the inception of the Loan, defendant charged plaintiffs an "Origination Fee" of $2,638.84. *Id.* ¶ 25. In a Pre-Approval Notice, defendant disclosed the Origination Fee as a "prepaid finance charge." ECF 23-3 ("Pre-Approval Notice"); *see also* ECF 20, ¶ 26. At the inception of the Loan, and afterwards, defendant also collected Insurance Premiums from plaintiffs. ECF 1, ¶¶ 27, 28. And, according to plaintiffs, they were improperly assessed a Late Fee in October 2018. *Id.* ¶¶ 41-47. They also complain as to the assessment of other Late Fees. *Id.* ¶ 50.

The RISC states that plaintiffs are "required to insure the Manufactured Home against physical damage," and have "the right to choose the entity through which the property insurance is obtained." ECF 23-2 at 5. Plaintiffs purchased property insurance from 21st Insurance, which is a tradename for defendant doing business in Maryland as a licensed insurance producer. ECF 23-2 at 3. According to plaintiffs, "21st Mortgage acted as the insurance agent for the sale of insurance policies with effective dates starting on February 3, 2017, February 3, 2018, and October 27, 2019." ECF 20, ¶ 29. Further, plaintiffs assert that for each policy, "21st Mortgage retained

---

[3] As discussed, *infra*, at this juncture I must assume the truth of the facts alleged in the suit. *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019).

Throughout the Memorandum Opinion, the Court cites to the electronic pagination. However, the electronic pagination does not always correspond to the page number imprinted on the particular submission.

thirty-five percent (35%) of the Insurance Premiums paid by the Prices." ECF 20, ¶ 38. Plaintiffs' insurance policy shows that they paid their first insurance premium to American Bankers Insurance Company of Florida ("ABI"), in the sum of $924.00. *See* ECF 23-4 (the "Insurance Policy").[4]

The RISC required plaintiffs to make payments on the Loan "[m]onthly, beginning 3/15/2017," with subsequent payments "due on the same day of each month after that." ECF 23-2 at 2; *see* ECF 20, ¶ 39. In effect, the RISC provided for a 15 day "grace period" to avoid a Late Fee. ECF 20, ¶ 46.

Plaintiffs received the Vehicle on February 3, 2017. *Id.* ¶ 41. In a "Delivery Certification" dated February 3, 2017 (ECF 23-5), plaintiffs agreed to change the payment due date under the RISC, in that they "commit[ed] to pay the first payment on [March 1, 2017]." In particular, the Delivery Certification states: "Borrower hereby confirms that the first payment date is: March 1, 2017." *Id.* at 2.

The RISC also allows defendant to charge a late fee "[i]f a payment is more than 15 days late." ECF 23-2 at 3; *see* ECF 20, ¶ 40. On October 17, 2018, defendant "charged the first Late Fee to the Prices . . . ." ECF 20, ¶ 43. However, plaintiffs allege that the "scheduled monthly payment to 21st Mortgage was not due under the CLEC RISC until October 15, 2018." *Id.* ¶ 45. And, they claim that they submitted their "monthly payment to 21st Mortgage on October 24, 2018," i.e., within the grace period. *Id.* ¶ 44. Additionally, plaintiffs allege that defendant "repeatedly charged and/or collected late fees prior to the time allowed in the Named Plaintiffs' RISC." *Id.* ¶ 118.[5]

---

[4] It is not clear who selected ABI.

[5] According to plaintiffs, defendant charged them a Late Fee on "10/17/2018, 11/19/2018, 1/17/2019, 2/18/2019, 3/18/2019, 4/17/2019, 5/20/2019, 6/17/2019, 7/17/2019, 8/19/2019, 9/17/2019, 10/17/2019, 11/18/2019, 12/17/2019, 1/17/2020, 2/17/2020, 3/17/2020, 4/17/2020,

On November 5, 2020, in the District Court of Maryland for Harford County, defendant filed an "action in Replevin" against plaintiffs for immediate possession of the manufactured home.  ECF 20, ¶ 52.  At the show cause hearing, the judge made a "factual finding," stating that "there's nothing in [the Delivery Certification] that says anything at all about changing the due date to the 1st.  It only says the first payment date is March 1st."  ECF 25-4 ("Replevin Hearing Transcript") at 42; *see* ECF 20, ¶ 54.

This suit followed.  ECF 6 ("Complaint").  As noted, defendant timely removed the suit to this Court on November 24, 2021.  ECF 1.

Defendant moved to dismiss on March 3, 2022, pursuant to Fed. R. Civ. P. 12(b)(6).  ECF 23.  However, the parties subsequently submitted a joint request to stay the case and to refer it to a magistrate judge for a settlement conference.  ECF 26.  By Order of April 12, 2022, I granted the stay (ECF 28), and referred the matter to a magistrate judge for a settlement conference.  ECF 29.  Despite the stay, and at about the time the Court granted the stay, defendant filed its Reply.  ECF 33.  The stay was lifted on December 1, 2022, because settlement discussions were unsuccessful.  ECF 41.

On December 6, 2022, defendant filed a Motion for Leave to file additional authority in support of its Motion to Dismiss.  ECF 42.  That day, I granted the Motion for Leave, but indicated that plaintiffs could move to rescind the Order as improvidently granted.  ECF 43.  The plaintiffs so moved.  ECF 44.  In conjunction with their Motion to Rescind, plaintiffs filed a Motion to Strike defendant's Motion for Leave.  ECF 45.

Additional facts are included, *infra*.

---

5/18/2020, 6/17/2020, 7/17/2020, 8/17/2020, 9/17/2020, 10/19/2020, 11/17/2020, 12/17/2020, 1/18/2021, 2/17/2021, 3/17/2021, 4/19/2021, 5/17/2021, and 7/19/2021."  ECF 20 at 17 n.1.

## II. Motion to Rescind and Motion to Strike

After the defendant filed its Motion to Dismiss, defendant claims to have "located additional authority that further supports dismissal of the 'commissions on insurance' claims asserted in Counts One, Three, and Six" of the Amended Complaint." ECF 42 at 3.  In particular, defendant submitted for the Court's consideration a 1942 Delaware opinion, *State v. Bankers Fin. Corp.,* 26 A.2d 220 (Del. 1942).  ECF 42-2.  According to defendant, the "Delaware court expressly rejected Plaintiffs' 'commission on insurance' theory of liability."  ECF 42 at 3.  Defendant also asserted, *id.*: "Plaintiffs will not be prejudiced by the Court's granting this Motion [for Leave] as (i) Plaintiff [sic] has been aware of this additional authority since November 10, 2022; (ii) 21st Mortgage does not oppose a written response from Plaintiffs addressing this additional authority; and (iii) the briefing on the Motion to Dismiss is within the page limits set forth in L.R. 105.3."  *Id.*

As noted, the Court granted the Motion for Leave with the proviso that, "by Dec. 20, 2022, plaintiffs may move to Rescind this Order as improvidently granted."  ECF 43.  On December 19, 2022, plaintiffs filed a Motion to Rescind (ECF 44) in conjunction with a Motion to Strike defendant's Motion for Leave.  ECF 45.  In their Motion to Strike, plaintiffs argue that "the additional authority provided by 21st Mortgage is not supplemental authority, but rather an eighty-year-old opinion that was readily available to 21st Mortgage well prior to the conclusion of briefing on the motion to dismiss."  *Id.* at 2.  In sum, plaintiffs contend that defendant's "Motion for Leave is an improper surreply."  *Id.*

To be sure, defendant could have located the case before submitting the Motion to Dismiss or the Reply.  That said, there are a variety of reasons that may explain the failure to identify the case at an earlier time.  Perhaps counsel did not expend as much time on research as might

otherwise have occurred, in light of the impending joint request for a stay and a settlement conference.  In any event, there is no prejudice to plaintiffs in allowing defendant to inform the Court about an additional case that might be relevant.

Accordingly, I shall deny plaintiffs' Motion to Rescind and Motion to Strike.

### III. Standard of Review

Defendant moves to dismiss the Amended Complaint under Fed. R. Civ. P. 12(b)(6).  ECF 23.  A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  *Nadendla v. WakeMed*, 24 F.4th 299, 304-05 (4th Cir. 2022); *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556

U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Nadendla*, 24 F.4th at 304-05; *Paradise Wire & Cable*, 918 F.3d at 317; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, *Miss.*, 574 U.S. 10, 10 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v.*

*Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012). But, "[m]ere recitals of a cause of action, supported only by conclusory statements, are insufficient to survive" a Rule 12(b)(6) motion. *Morrow v. Navy Federal Credit Union*, ___ Fed. App'x ___, 2022 WL 2526676, at *2 (4th Cir. July 7, 2022).

In connection with a Rule 12(b)(6) motion, courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards*, 178 F.3d at 243). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'" *Goodman*, 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst*, 4 F.3d at 250).

Notably, a plaintiff may not cure a defect in a complaint or otherwise amend a complaint by way of her opposition briefing. *See, e.g.*, *So. Walk at Broadlands Homeowner's Ass'n, Inc. v.*

9

*OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) ("It is well-established that parties cannot amend their complaints through briefing or oral advocacy."); *Glenn v. Wells Fargo Bank, N.A.*, DKC-3058, 2016 WL 3570274 at \*3 (D. Md. July 1, 2016) (declining to consider declaration attached to brief opposing motion to dismiss because, among other things, it included allegations not alleged in the suit); *Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n. 4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998); *Mylan Labs., Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991) ("'[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss'") (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984)), *aff'd*, 2 F.3d 56 (4th Cir. 1993).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). *See Goines*, 822 F.3d at 166 (a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits."); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). In contrast, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]" *Clatterbuck*

*v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed. v. Town of Gilbert*, 576 U.S. 155, 135 S. Ct. 2218 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

And, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167. Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Id.* Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

Moreover, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines,* 822 F.3d at 166 (citations omitted); *see also Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 558 (2017); *Kensington Volunteer Fire Dep't v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011)) (emphasis in original) (citation

11

omitted); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

Therefore, under the principles outlined above, I may consider the following documents attached to defendant's Motion to Dismiss (ECF 23), because they are referenced in or otherwise integral to the Amended Complaint (ECF 20), their authenticity is not disputed, and plaintiffs do not take issue with their consideration: the RISC (ECF 23-2); the Pre-Approval Notice (ECF 23-3); the Insurance Policy (ECF 23-4); and the Delivery Certification (ECF 23-5). Likewise, I may consider the exhibits submitted with the Opposition because they are public documents. *See* ECF 25-1 to ECF 25-4. However, I may not consider ECF 33-1, which is plaintiffs' loan payment history from March 2017 to September 2018, because the document is neither referenced in nor integral to the Amended Complaint.

### IV. Discussion

### A. Origination Fee

In Count One and Count Two of their Amended Complaint, plaintiffs allege that defendant charged and collected an Origination Fee from them in connection with the Loan, in the sum of $2,638.84, in violation of CLEC.  ECF 20, ¶¶ 25, 88, 93-101.  In relevant part, C.L. § 12-1005(a)(2) states: "In the case of a loan to a consumer borrower, no loan fees, points, finder's fees, or other charges may be charged and collected unless . . . (ii) [t]he loan is secured by a lien on residential real property."

Defendant argues that plaintiffs' Origination Fee claims are preempted by the Depository Institutions Deregulation and Monetary Control Act of 1980 (the "DIDMCA"), 12 U.S.C §§ 1735f-7a, *et seq*.  *See* ECF 23-1 at 10-18.  The DIDMCA provides: "The provisions of the constitution or the laws of any State expressly limiting the rate or amount of interest, discount points, finance charges, or other charges which may be charged, taken, received, or reserved shall not apply to any loan, mortgage, credit sale, or advance . . . ."  12 U.S.C. § 1735f-7a(a)(1).  And, an origination fee is a "finance charge" under federal law.  *See* 15 U.S.C. § 1605(a)(3) (defining "finance charge" under the Truth in Lending Act [("TILA")] to include a "loan fee"); *see also Abel v. Knickerbocker Realty Co*., 846 F. Supp. 445, 448 (D. Md. 1994) (finding that an "origination fee" constitutes a "finance charge" under TILA).

Thus, where applicable, the DIDMCA preempts any state law regulation of origination points.  *See Petry v. Wells Fargo Bank, N.A*., 597 F. Supp. 2d 558, 564 n.6 (D. Md. 2009) ("DIDMCA preempts '[t]he provisions of the constitution or the laws of any State expressly limiting the rate or amount of interest, discount points, finance charges, or other charges which may be charged, taken, received, or reserved . . . .'" (alterations in original)); *see also Wolfert ex*

13

*rel. Est. of Wolfert v. Transamerica Home First, Inc.*, 439 F.3d 165, 175 (2d Cir. 2006) (same); *Moyer v. Citicorp Homeowners, Inc.*, 799 F.2d 1445, 1446 (11th Cir. 1986) (noting that the "DIDMCA expressly preempts all state laws").

Notably, however, preemption under the DIDMCA is subject to two exceptions, which the parties characterize as "overrides." *See* ECF 23-1 at 14; ECF 25 at 10. First, the DIDMCA allowed states to enact a law between April 1, 1980, and April 1, 1983, expressly asserting that the state does not want DIDMCA preemption to apply. 12 U.S.C. § 1735f-7a(b)(2). Second, "[a]t any time after March 31, 1980, any State may adopt a provision of law placing limitations on discount points or such other charges . . . ." 12 U.S.C. § 1735f-7a(b)(4).

Here, the dispute between the parties revolves around the text and meaning of the second exception. Specifically, the parties disagree on whether an origination fee falls within the scope of the term "such other charges," as set forth in 12 U.S.C. § 1735f-7a(b)(4). *See* ECF 25 at 9; ECF 33 at 3. The dispute implicates principles of statutory construction.

The cases are legion for the proposition that, "[w]hen faced with a statutory provision, 'the starting point for any issue of statutory interpretation . . . is the language of the statute itself.'" *Redeemed Christian Church of God (Victory Temple) Bowie, Maryland v. Prince George's County, Maryland*, 17 F.4th 497, 508 (4th Cir. 2021) (quoting *D.B. v. Cardall*, 826 F.3d 721, 734 (4th Cir. 2016)) (alteration in original); *see Murphy v. Smith*, ___ U.S. ___, 138 S. Ct. 784, 787 (2018) ("As always, we start with the specific statutory language in dispute."); *Navy Fed. Credit Union v. LTD fin. Servs., LP*, 972 F.3d 344, 356 (4th Cir. 2020) ("'As in all statutory construction cases,' we start with the plain text of the provision." (quoting *Marx v. General Revenue Corp.*, 568 U.S. 371, 376 (2013)); *United States v. George*, 946 F.3d 643, 645 (4th Cir. 2020) ("When interpreting a statute, courts must 'first and foremost strive to implement congressional intent by

examining the plain language of the statute.'") (quoting *United States v. Abdelshafi*, 592 F.3d 602, 607 (4th Cir. 2010)); *see also United States v. Bryant*, 949 F.3d 168, 174-75 (4th Cir. 2020); *Ignacio v. United States*, 674 F.3d 252, 254 (4th Cir. 2012).

"'[A]bsent ambiguity or a clearly expressed legislative intent to the contrary,'" courts apply the "plain" meaning" of the statute. *Abdelshafi*, 592 F.3d at 607 (quoting *United States v. Bell*, 5 F.3d 64, 68 (4th Cir.1993)). This is "determined by reference to its words' 'ordinary meaning at the time of the statute's enactment.'" *Abdelshafi*, 592 F.3d at 607 (quoting *United States v. Simmons*, 247 F.3d 118, 122 (4th Cir.2001)). To ascertain a statute's meaning, "'the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *Gundy v. United States*, ___ U.S. ___, 139 S. Ct. 2116, 2126 (2019) (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007)).

Terms that are not defined are "'interpreted as taking their ordinary, contemporary, common meaning.'" *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (citation omitted); accord *United States v. George*, 946 F.3d 643, 645 (4th Cir. 2020). Courts may also consider a statute's history and purpose to give effect to its language. *See Gundy*, 139 S. Ct. at 2126. However, courts may "not resort to legislative history to cloud a statutory text that is clear." *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994); *see Raplee v. United States*, 842 F.3d 328, 332 (4th Cir. 2016) ("If the meaning of the text is plain ... that meaning controls.").

As noted, 12 U.S.C. § 1735f-7a(a)(1) of the DIDMCA contains a list that includes multiple items subject to express preemption: "[i] the rate or amount of interest, [ii] discount points, [iii] finance charges, or [iv] other charges." Conversely, the DIDMCA's § (b)(4) override is narrower in scope and limited to "[i] discount points or [ii] such other charges." 12 U.S.C. § 1735f-7a(b)(4).

Defendant argues that "[b]ecause Congress specifically included the term 'finance charges' in (a)(1), but did not include the term 'finance charges' in the (b)(4) override, a plain reading of the statute leads to the conclusion that Congress did not intend for all 'finance charges' to be included in the (b)(4) override."  ECF 23-1 at 15-16 (citing *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 102 n.5 (2012) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended."); *Cunningham v. Scibana*, 259 F.3d 303, 308 (4th Cir. 2001) ("Although the two terms are quite similar, we must assume that Congress made a deliberate choice to use different language.")).

Moreover, relying on the canons of *noscitur a sociis* and *esjudem generis*, defendant asserts that "'such other charges' means only charges similar to discount points."  ECF 23-1 at 16.  The Fourth Circuit explained these interpretive doctrines in *Wikimedia Found. v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 14 F.4th 276, 296–97 (4th Cir. 2021) (first alteration in original) (citations omitted):

> [W]e rely on the principle of *noscitur a sociis*—a word is known by the company it keeps—to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress. . . .  Relatedly, where general words follow specific words in a statutory enumeration, the *ejusdem generis* canon counsels that the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words. . . .  Here, too, *noscitur a sociis* and *ejusdem generis* color our understanding of "other material" and "such other material" to mean those like a FISA application or order. . . .  *See also Such*, Merriam-Webster, https://www.merriam-webster.com/dictionary/such (last visited August 18, 2021) (defining "such" as "of the character, quality, or extent previously indicated or implied").

In defendant's view, "the very nature of a loan fee differs from that of a discount point." ECF 23-1 at 17 (noting that "Discount points change the interest rate that borrowers pay over time for the life of their loan" while "Loan fees are an administrative charge which allow lenders to recoup the cost of origination").  Accordingly, defendant maintains that "State law limitations on

discount points may override DIDMCA preemption," but "State law limitations on loan fees may not." *Id.*

Conversely, plaintiffs argue that "[t]he phrase 'such other charges' in DIDMCA § 1735f-7a(b)(4) is ambiguous, and thus this Court may consider the legislative history in determining what 'such other charges' Congress intended to exempt from preemption." ECF 25 at 9. "'A statute is ambiguous if it 'lends itself to more than one reasonable interpretation.'" *Lee v. Norfolk Southern Ry. Co.*, 802 F.3d 626, 631 (4th Cir. 2015) (quoting *Newport News Shipbuilding & Dry Dock Co. v. Brown*, 376 F.3d 245, 248 (4th Cir.2004)).

According to plaintiffs, Congress could have intended the (b)(4) override "to exempt all charges that are similar to discount points, in the sense that such charges are unrelated to state usury laws that set caps on interest rates." ECF 25 at 10. In support of their position, plaintiffs note that defendant's interpretation is "logically incomplete" in that "counsel can think of no other charges that provide the borrower with a 'specific, below-market interest rate' . . . because no such charges exist." ECF 25 at 11, 12. Consequently, plaintiffs argue: "Congress could not have intended 'such other charges' to be charges similar to discount points (in the way suggested by 21st Mortgage), because that would render the phrase 'such other charges' meaningless." *Id.* at 12 (citing *United States v. Tohono O'Odham Nation*, 563 U.S. 307 (2011) ("Courts should not render statutes nugatory through construction.").

However, as defendant notes in the Reply, "discount points" can take many names, including "loan discount fees" (*Vandenbroeck v. CommonPoint Mortg. Co*., 2004 WL 1778933, at *2 (Mich. Ct. App. Aug. 10, 2004)); "discounts" (15 U.S.C. § 1605(a)(1)); "points" (*Wooten v. Quicken Loans, Inc.*, 626 F.3d 1187, 1189 (11th Cir. 2010)); "mortgage points" (*Baird v. Comm'r of Internal Revenue*, 68 T.C. 115, 131 (1977)); and "buy downs" (*Wooten*, 626 F.3d at 1190)).

17

ECF 33 at 6-7.  Thus, defendant maintains that Congress included the phrase "or such other charges" in the DIDMCA's § (b)(4) preemption override to "account for other common terms that refer to the general practice of charging an upfront fee for a reduced interest rate."  *Id*. at 7 (citing *Wikimedia*, 14 F.4th at 296 ("[G]eneral words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.")).  And, defendant maintains that "this intent is further evidenced by § (b)(4)'s use of the qualifying word 'such' before 'other charges.'"  ECF 33 at 7 (citing *Wikimedia*, 14 F.4th at 297 (defining "such" to mean "of the character, quality, or extent previously indicated or implied") (citation omitted)).

In addition, defendant contends that if Congress had intended for "discount points or such other charges" to mean "all charges that are included in the annual percentage rate other than the rate of interest," as plaintiffs contend (ECF 35 at 13), then Congress would have written the § (b)(4) override to read: "At any time after March 31, 1980, any State may adopt a provision of law placing limitations on discount points, finance charges, or other charges except the rate or amount of interest . . . ."  ECF 33 at 5; *see also Smith v. Fidelity Consumer Discount Co*., 898 F.2d 907, 912 (3d Cir. 1990) (finding that if Congress intended the plaintiffs' interpretation of the DIDMCA, it would have drafted the DIDMCA differently).  Thus, "we're left with nothing but the doubtful proposition that Congress sought to accomplish in a 'surpassingly strange manner' what it could have accomplished in a much more straightforward way."  *Azar v. Allina Health Servs*., ___ U.S. ___, 139 S. Ct. 1804, 1813 (2019) (citing *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 647 (2012)).

In the Opposition, plaintiffs fail to identify any plain language from the DIDMCA, or any case authority, for the proposition that Congress intended for the DIDMCA's (b)(4) exception to "include all charges that are included in the annual percentage rate other than the rate of interest."

ECF 25 at 13 (emphasis omitted).  Instead, plaintiffs point to language of a proposed amendment

to the DIDMCA, offered in 1979 by Senator William Proxmire, stating "except that at any time

after the date of enactment of this Act any State may adopt a provision of law placing limitations

on discount points or such other charges on any such loan, mortgage, or advance.'"  125 CONG.

REC. 30,659 (1979); *see* ECF 25-1 at 2.

      The Supreme Court has said that "floor statements by individual legislators rank among

the least illuminating forms of legislative history."  *N.L.R.B. v. SW Gen., Inc*., 580 U.S. 288, 307

(2017).  "What motivates one legislator to make a speech about a statute is not necessarily what

motivates scores of others to enact it, and the stakes are sufficiently high for [the Court] to eschew

guesswork."  *United States v. O'Brien*, 391 U.S. 367, 384 (1968).  Furthermore, where the plain

language of a statute is clear, "ambiguous legislative history" should not "muddy" that statutory

language.  *Azar*, 139 S. Ct. at 1814.  A court may "consider other indicia of congressional intent[,]

such as the legislative history," only when the statutory text is ambiguous.  *Copley v. United States*,

959 F.3d 118, 123 (4th Cir. 2020) (quotation marks and citation omitted).

      Here, the plain language of the statute and the basic rules of statutory construction indicate

that the scope of the phrase "discount points or such other charges" encompasses discount points

as well as charges similar to them, *i.e.*, upfront fees paid in exchange for a lower interest rate.  In

particular, the phraseology of "such other charges" suggests that it was meant to be akin to the

only category specifically mentioned: discount points.  The inclusion of the restrictive word 'such'

in the (b)(4) override reflects the intention of Congress to create a narrow exemption.

      Certainty, Congress could have mirrored the list from § (a)(1) in § (b)(4).  Its election not

to do so suggests that Congress meant to restrict the scope of the § (b)(4) override.  *See Romag

Fasteners, Inc v. Fossil, Inc.*, ___ U.S. ___, 140 S. Ct. 1492, 1495 (2020) ("Nor does this Court

usually read into statutes words that aren't there. It's a temptation we are doubly careful to avoid when Congress has (as here) included the term in question elsewhere in the very same statutory provision."); *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quotation marks and citation omitted); *see also Fairfax v. CBS Broad. Inc.*, 534 F. Supp. 3d 581, 600 n.17 (E.D. Va. 2020) ("When the legislature uses a term or phrase in one . . . provision but excludes it from another, courts do not imply an intent to include the missing term in [the] . . . provision where the term or phrase is excluded.  Instead, omission of the same provision from a similar section is significant to show different legislative intent for the two sections." (alterations in original) (citation omitted)), *aff'd*, 2 F.4th 286 (4th Cir. 2021).

In my view, if I were to adopt plaintiffs' interpretation, this would give "unintended breadth to the Acts of Congress."  *Yates v. United States*, 574 U.S. 528, 543 (2015); *Wikimedia*, 14 F.4th at 296.  The plain language of the statute does not permit plaintiffs to shoehorn the elephantine interpretation of "all charges that are included in the annual percentage rate other than the rate of interest" into the "mousehole" of the phrase "or such other charges."  *Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 468 (2001) ("Congress . . . does not, one might say, hide elephants in mouseholes.").  Accordingly, the DIDMCA's (b)(4) override is not applicable, and plaintiffs' Origination Fee claims are dismissed.

### 2. Insurance Premiums

In Counts One, Three, and Six, plaintiffs contend that defendant violated CLEC by charging an insurance premium and receiving a commission as a licensed insurance producer for the placement of the insurance.  *See* ECF 20, ¶¶ 89, 105, 106, 133.  According to plaintiffs,

defendant's receipt of a commission from the insurer violates C.L. § 12-1005(d)(1), which limits the fees a credit grantor can charge to those that are the "actual and verifiable expenses of the credit grantor not retained by him."  C.L. § 12-1005(d)(1) ("[A] fee permitted under subsection (b) of this section may not be charged and collected unless . . . (ii) The fee is an actual and verifiable expense of the credit grantor not retained by him.").

Defendant argues that plaintiffs "paid the property insurance premium set by ABI and approved by the Maryland Insurance Administration."  ECF 23-1 at 18-19.  According to defendant, "21st Mortgage did not charge or collect any more than this amount nor did it retain a fee as the credit grantor.  Rather 21st Mortgage received a commission from ABI in its capacity as a licensed insurance producer for the placement of the insurance."  *Id*. at 19.  Thus, it is defendant's position that the payment of the commission is "not subject to CLEC, but is authorized by Maryland's Insurance Article."  *Id*.

Under Maryland law, the rates for all homeowner's insurance policies must be filed with, and approved by, the Maryland Insurance Administration.  *See* Md. Code (2013 Repl. Vol.), §§ 11-206, 11-213 of the Insurance Article ("Ins."); *see also Gov't Emps. Ins. Co. & GEICO v. Ins. Comm'r*, 630 A.2d 713, 715 n.1 (Md. 1993) ("'Rate filings' are a regulatory mechanism by which insurance carriers are required by legislation to publicly file their rates with the Insurance Commissioner by the date they become effective.").

Here, it is undisputed that defendant is a licensed insurance producer that plaintiffs voluntarily chose to insure their Vehicle.  ECF 23-2 at 3.  CLEC indicates that the placement of insurance is governed by the Insurance Article.  C.L. § 12-1007(e) ("The offer and placement of insurance under this section shall be subject to the provisions of the Insurance Article.").  And, as

noted, Maryland's Insurance Article allows licensed insurance producers to receive commissions for the placement of insurance. *See* Ins. § 10-130(a).

Plaintiffs concede that CLEC and "the two statutory provisions do not . . . conflict with each other." ECF 25 at 25. Rather, they contend that "CLEC states that where the licensed insurance agent is also the credit grantor in connection with a loan to a consumer borrower under CLEC and the licensed insurance agent retains the commission of the sale of an insurance policy, that amount that it has retained violates the CLEC." *Id.*

In support of their position, plaintiffs cite two cases: *B.F. Saul Company v. West End Park North, Inc*., 250 Md. 707, 246 A.2d 591 (1968), and *The Equitable Life Assurance Society of the United States v. Insurance Commissioner of Maryland*, 251 Md. 143, 246 A.2d 604 (1968). However, neither case supports plaintiffs' argument.

First, both cases were decided in 1968, fifteen years before the passage of CLEC in 1983, and thus do not provide persuasive value with regard to the relevant interpretation of CLEC. Second, the cases hold that a lender may retain a portion of an insurance premium, but any such retained amount constitutes "interest" for purposes of the usury limitations found in C.L. §§ 12-101(e), 12-105(e). *See B.F. Saul*, 250 Md. at 727-28, 246 A.2d at 603-04; *Equitable Life*, 251 Md. at 148, 246 A.2d at 607. And, as defendant notes, ECF 33 at 14, these holdings are now inconsistent with the plain language of CLEC: "Premiums for any insurance coverage permitted by this section are not interest with respect to the loan." C.L. § 12-1007(d); *see also* C.L. § 12-1005(e) ("For purposes of this subtitle, fees and charges permitted under this section are not interest with respect to a loan."). Accordingly, plaintiffs have failed to offer interpretive guidance on whether CLEC permits a credit grantor to receive an insurance commission in its capacity as a licensed insurance producer.

In the Court's view, the commission paid to defendant by an insurer is an entirely separate transaction. The commission was not a fee paid by plaintiffs. And, plaintiffs do not allege that defendant added a fee to the insurer's filed and approved rate. Furthermore, plaintiffs do not contest that they would have paid the same insurance premium regardless of the insurance producer. *See* ECF 23-1 at 19; ECF 33 at 14. Thus, because defendant—acting in its capacity as a licensed insurance producer—was paid a commission authorized by the Insurance Article for the placement of insurance, defendant is not liable under CLEC in its capacity as a credit grantor.

Accordingly, the Court shall dismiss all claims in the Amended Complaints based on defendant's receipt of a commission for its placement of plaintiffs' property insurance policy.

### 3. Late Fees

In Counts One, Four, and Five, plaintiffs allege that defendant "repeatedly charged and/or collected late fees prior to the time allowed in the Named Plaintiffs' RISC." ECF 30, ¶¶ 90, 118; *see also* ¶ 125. In particular, plaintiffs assert that their scheduled monthly payment was due on the 15th of each month, and that they had a 15-day grace period before a Late Fee could be assessed. *Id*. ¶¶ 45, 46.

In the Motion to Dismiss, defendant argues that "Plaintiffs' Late Fee claims are meritless because Plaintiffs voluntarily amended their [RISC] to change the payment due date to the 1st of each month." ECF 23-1 at 21. As noted, the Delivery Certification indicates that plaintiffs "confirm[ed] that the first payment date is: March 1, 2017" and they "commit[ed] to pay the first payment on this date." ECF 23-5 at 2. According to defendant, "the [RISC], as amended by the Delivery Certification, therefore obligates Plaintiffs to make their first payment on March 1, 2017 and to make subsequent payments 'on the same day of each month after that.'" ECF 23-1 at 21 (quoting ECF 23-2 at 2).

Conversely, plaintiffs maintain that while they "voluntarily agreed to pay the *first* payment on March 1, 2017, . . . it is untrue that this voluntary amendment extended to each and every *subsequent* payment made on the RISC." ECF 25 at 29 (emphasis in original). Instead, plaintiffs' position is that "the plain language of the Delivery Certification, even when taken together with language in the RISC, indicates that only the *first* payment will be modified. *Id*. at 30 (emphasis in original)

The parties' arguments require the Court to construe the plain meaning of the Delivery Certification and the RISC. Accordingly, principles of contract interpretation are apt.

Generally speaking, Maryland applies the law of the state where the contract was formed ("*lex loci contractus*"), unless the parties to the contract agreed to be bound by the law of another state. *See, e.g.*, *Cunningham v. Feinberg*, 441 Md. 310, 326, 107 A.3d 1194, 1204 (2015); *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 618, 925 A.2d 636, 648 (2007); *Am. Motorists Ins. Co. v. ARTRA Grp., Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995); *TIG Ins. Co. v. Monongahela Power Co.*, 209 Md. App. 146, 161, 58 A.3d 497, 507 (2012), *aff'd*, 437 Md. 372, 86 A.3d 1245 (2014). "For choice-of-law purposes, a contract is made where the last act necessary to make the contract binding occurs." *Konover Prop. Tr., Inc. v. WHE Assocs.*, 142 Md. App. 476, 490, 790 A.2d 720, 728 (2002) (citing *Commercial Union Ins. Co. v. Porter Hayden Co.*, 116 Md. App. 605, 672, 698 A.2d 1167, 1200 (1997), *cert. denied*, 348 Md. 205, 703 A.2d 147 (1997)).

The parties have not indicated where plaintiffs executed the Delivery Certification and do not discuss the law that the Court should apply. But, to the extent that the Delivery Certification governed the plaintiffs, who reside in Maryland, I will construe the contract in light of Maryland law.

Under Maryland law, the interpretation of a contract is "ordinarily a question of law for the court." *Grimes v. Gouldmann*, 232 Md. App. 230, 235, 157 A.3d 331, 335 (2017); *see also Spacesaver Sys., Inc. v. Adam*, 440 Md. 1, 7, 98 A.3d 264, 268 (2014); *Myers v. Kayhoe*, 391 Md. 188, 198, 892 A.2d 520, 526 (2006); *Towson Univ. v. Conte*, 384 Md. 68, 78, 862 A.2d 941, 946 (2004); *Lema v. Bank of Am., N.A.*, 375 Md. 625, 641, 826 A.2d 504, 513 (2003); *Under Armour, Inc. v. Ziger/Snead, LLP*, 232 Md. App. 548, 552, 158 A.3d 1134, 1136 (2017). "'The cardinal rule of contract interpretation is to give effect to the parties' intentions.'" *Dumbarton Imp. Ass'n. Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51, 73 A.3d 224, 232 (2013) (citation omitted). To determine the parties' intention, courts look first to the written language of the contract. *Walton v. Mariner Health of Maryland, Inc.*, 391 Md. 643, 660, 894 A.2d 584, 594 (2006) ("[G]enerally, when seeking to interpret the meaning of a contract our search is limited to the four corners of the agreement.").

"Maryland courts interpreting written contracts have long abided by the law of objective contract interpretation, which specifies that 'clear and unambiguous language' in an agreement 'will not give way to what the parties thought the agreement meant or was intended to mean.'" *Urban Growth Prop. Ltd. P'ship v. One W. Balt. St. Assocs. LLC*, No. 882, Sept. Term, 2015, 2017 WL 526559, at *5 (Md. Ct. Spec. App. Feb. 9, 2017) (citation omitted) (unpublished); *see Cochran v. Norkunas*, 398 Md. 1, 16, 919 A.2d 700, 709 (2007); *W.F. Gebhardt & Co., Inc. v. American European Ins. Co.*, 250 Md. App. 652, 666, 252 A.3d 65, 73 (2021); *Huggins v. Huggins & Harrison, Inc.*, 220 Md. App. 405, 417, 103 A.3d 1133, 1139 (2014) (internal quotations and alteration omitted). A court will presume that the parties meant what they stated in an unambiguous contract, without regard to what the parties to the contract subjectively intended or personally thought it meant. *See Martz v. Day Development Co., L.C.*, 35 F.4th 220, 225 (4th Cir.

2022); *Dumbarton*, 434 Md. at 51, 73 A.3d at 232; *Dennis v. Fire & Police Employees' Ret. Sys.*, 390 Md. 639, 656, 890 A.2d 737, 747 (2006); *PaineWebber Inc. v. East*, 363 Md. 408, 414, 768 A.2d 1029, 1032 (2001); *see also, e.g., Hartford Acc. & Indem. Co. v. Scarlett Harbor Assoc. Ltd. P'ship*, 109 Md. App. 217, 291, 674 A.2d 106, 142 (1996) ("Where the language of a contract is clear, there is no room for construction; it must be presumed that the parties meant what they expressed."), *aff'd*, 346 Md. 122, 695 A.2d 153 (1997).

A court's "task, therefore, when interpreting a contract, is not to discern the actual mindset of the parties at the time of the agreement." *Dumbarton*, 434 Md. at 52, 73 A.3d at 232. Rather, the court is to "'determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated.'" *Id*. (quoting *Gen. Motors Acceptance v. Daniels*, 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985)); *see Cochran*, 398 Md. 1, 919 A.2d at 710 ("Under the objective theory of contracts, [courts] look at what a reasonably prudent person in the same position would have understood as to the meaning of the agreement."); *Scarlett Harbor*, 109 Md. App. at 291, 674 A.2d at 142 ("[T]he court must, as its first step, determine from the language of the agreement what a reasonable person in the position of the parties would have meant at the time the agreement was effectuated.").

Notably, "the plain meaning is determined by 'focus[ing] on the four corners of the agreement.'" *Martz*, 35 F.4th at 225 (citation omitted) (alteration in *Martz*). "'The words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which they are employed.'" *DIRECTV, Inc. v. Mattingly*, 376 Md. 302, 313, 829 A.2d 626, 632-33 (2003) (citations omitted). But, Maryland courts also turn to the dictionary "'to supply contractual language with its ordinary and accepted meanings . . . .'" *W.F. Gebhardt & Co., Inc.,*

250 Md. App. at 668, 252 A.3d at 74 (quoting *Credible Behavioral Health, Inc. v. Johnson*, 466 Md. 380, 394, 220 A.3d 303, 311 (2019)).

A contract is not ambiguous merely because the parties do not agree on its meaning. *Fultz v. Shaffer*, 111 Md. App. 278, 299, 681 A.2d 568, 578 (1996). "Furthermore, 'simply because [a party] can point to several slightly different dictionary definitions of [a word] does not render that term ambiguous.'" *W.F. Gebhardt & Co., Inc.*, 250 Md. App. 652, 252 A.3d at 74 (quoting *Rigby v. Allstate Indem.*, 225 Md. App. 98, 110, 123 A.3d 592, 598-99 (2015)) (alterations in *W.F. Gebhardt & Co., Inc.*). A contract is ambiguous "'if, to a reasonable person, the language used is susceptible of more than one meaning or is of doubtful meaning.'" *Martz*, 35 F.4th at 225 (citation omitted); *see also Cochran*, 398 Md. at 17, 919 A.2d at 710; *Sy-Lene of Washington*, 376 Md. at 167, 829 A.2d at 547; *Auction & Estate Representatives, Inc. v. Ashton*, 354 Md. 333, 340, 731 A.2d 441, 444-45 (1999); *Calomiris v. Woods*, 353 Md. 425, 436, 727 A.2d 358, 363 (1999); *W.F. Gebhardt*, 250 Md. App. at 667, 252 A.3d at 74.

The determination of whether a contract is ambiguous is a question of law. *Towson Univ.*, 384 Md. at 78, 862 A.2d at 946; *Sy-Lene of Washington*, 376 Md. at 163, 829 A.2d at 544. Generally, "'ambiguities are resolved against the draftsman of the instrument.'" *John L. Mattingly Const. Co., Inc. v. Hartford Underwriters Ins. Co.*, 415 Md. 313, 334, 999 A.2d 1066, 1078 (2010).

To ascertain whether a contract is ambiguous, a court considers "the character of the contract, its purpose, and the facts and circumstances of the parties at the time" that they enter into the contract. *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388, 488 A.2d 486, 488 (1985). But, "'[i]f only one reasonable meaning can be ascribed to the [contract] when viewed in context, that meaning necessarily reflects the parties' intent.'" *Cty. Comm'rs for Carroll Cty. v.*

*Forty W. Builders, Inc.*, 178 Md. App. 328, 377, 941 A.2d 1181, 1209 (2008) (quoting *Labor Ready, Inc. v. Abis*, 137 Md. App. 116, 128, 767 A.2d 936, 942 (2001)).

   "It is a fundamental principle of contract law that it is 'improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply to avoid hardships.'" *Calomiris*, 353 Md. at 445, 727 A.2d at 368 (quoting *Canaras v. Lift Truck Servs.*, 272 Md. 337, 350, 322 A.2d 866, 873 (1974)); *see Loudin Ins. Agency, Inc. v. Aetna Cas. & Sur. Co.*, 966 F.2d 1443 *Table), 1992 WL 145269, at *5, 966 F.2d 1443 (4th Cir.1992) (per curiam) ("[A] court will not rewrite the parties' contract simply because one party is no longer satisfied with the bargain he struck."). Therefore, a court may not "add or delete words to achieve a meaning not otherwise evident from a fair reading of the language used." *Brensel v. Winchester Constr. Co.*, 392 Md. 601, 624, 898 A.2d 472, 485 (2006).

   Consideration of extrinsic evidence is unnecessary when a contract is unambiguous. *DIRECTV*, 376 Md. at 312, 829 A.2d at 630 (citations omitted); *see Clendenin Bros. v. U.S. Fire Ins. Co.*, 390 Md. 449, 459, 889 A.2d 387, 393 (2006). Conversely, if the contract is ambiguous, "'the court must consider any extrinsic evidence which sheds light on the intentions of the parties at the time of the execution of the contract.'" *Cty. Commissioners of Charles Cty. v. St. Charles Associates Ltd. P'ship*, 366 Md. 426, 445, 784 A.2d 545, 556 (2001) (citation omitted); *accord John L. Mattingly Const. Co.*, 415 Md. at 327, 999 A.2d at 1074; *see Point's Reach Condominium Council of Unit Owners v. Point Homeowners Ass'n, Inc.*, 321 Md. 152, 582 A.2d 493, 495 (1990). For example, if a contract is ambiguous, "'extrinsic evidence may be consulted to determine . . . whether the ambiguous language has a trade usage.'" *Mut. Fire Ins. Co. of Calvert Cty. v. Ackerman*, 162 Md. App. 1, 15, 872 A.2d 110, 118 (2005) (quoting *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 404, 488 A.2d 486, 497 (1985)); *see Della Ratta, Inc. v. Am. Better*

*Cmty. Developers, Inc.*, 38 Md. App. 119, 130, 380 A.2d 627, 635 (1977).  But, extrinsic evidence may "not be used to contradict other, unambiguous language."  *Calomiris*, 353 Md. at 441, 727 A.2d at 366.  Moreover, the court may construe an ambiguous contract only "'if there is no factual dispute in the evidence.'"  *CB Structures, Inc. v. Potomac Electric Power Co.*, 122 F. Supp. 3d 247, 251 (D. Md. 2015) (citation omitted); *see also Chorley Entrs. v. Dickey's Barbecue Restaurants, Inc.*, 807 F.3d 553, 563 (4th Cir. 2015); *Pac. Indem. Co.*, 302 Md. at 389, 488 A.2d at 489.

Beginning with the text of the RISC, it is undisputed that the document required plaintiffs to make payments "[m]onthly, beginning 3/15/2017."  ECF 23-2 at 2.  In other words, the due date for plaintiffs' first, second, and third payment under the RISC would have been 3/15/2017, 4/15/2017, and 5/15/2017, respectively.  And, it is further undisputed that the Delivery Certification modified the RISC.  *Id.*  ("Borrower hereby requests 21st Mortgage Corporation to modify the contract date from that which is shown on the [RISC] to the delivery date shown above).

However, the Delivery Certification is only explicit in regard to the due date for the first payment.  ECF 23-5 at 2 ("Borrower hereby confirms that the first payment date is: March 1, 2017.").  Although it is clear that the Delivery Certification changed the date of the first payment from 3/15/2017 to 3/1/2017, it is not clear that the document modified the due date of subsequent payments.  In the Court's view, a reasonably prudent person could conclude that the Delivery Certification only modified the due date of the first payment, while keeping the remaining due dates (4/15/2017, 5/15/2017, etc.) intact.  Indeed, according to the Replevin Hearing Transcript, the State judge stated: "[T]here's nothing in [the Delivery Certification] that says anything at all about changing the due date to the 1st.  It only says the first payment date is March 1st."  ECF 25-4 at 42.

In the present posture of the case, the successive due dates are arguably ambiguous. It is certainly not clear that the due dates are those alleged by defendant.

Moreover, "in the context of a motion to dismiss, the construction of an ambiguous contract 'is a question of fact which, if disputed, is not susceptible of resolution under a motion to dismiss for failure to state a claim.'" *Chartier v. M. Richard Epps, P.C.*, ELH-14-1071, 2014 WL 4748629, at *13 (D. Md. Sept. 23, 2014) (quoting *Wolman v. Tose*, 467 F.2d 29, 34 (4th Cir.1972)). "At the pleading stage, if a contract is found to be ambiguous, a defendant's motion to dismiss must be denied." *View Point Med. Sys., LLC v. Athena Health, Inc*., 9 F. Supp. 3d 588, 600 (D. Md. 2014); *see also Spotswood v. Hertz Corp.*, WMN-16-1200, 2016 WL 6879938, at *17 (D. Md. Nov. 22, 2016). Therefore, I shall deny defendant's Motion to Dismiss with respect to plaintiffs' Late Fee claims.

## IV.  Conclusion

For the reasons stated above, I shall grant the Motion to Dismiss in part and deny it in part. I shall dismiss all claims related to the Origination Fee and insurance premiums, with prejudice (part of Count One and Counts Two, Three, and Six). Insofar as Count One involves claims related to Late Fees, the claim shall proceed. I shall also deny the Motion to Dismiss as to Counts Four and Five.

Further, I will deny the Motion to Rescind and the Motion to Strike.

An Order follows, consistent with this Memorandum Opinion.


Date:   February 23, 2023                                          /s/
                                                           Ellen L. Hollander
                                                           United States District Judge